UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARMANDO COLON,

                              Plaintiff,

        v.

ANTHONY J. ANNUCCI, *Commissioner*;
SUPT. JOSEPH BELLNIER, *Deputy
Commissioner*; DONALD VENETTOZZI,
*Director of Special Housing and Inmate
Discipline*; WILLIAM F. KEYSER,
*Superintendent*; EDWARD BURNETT,
*Deputy Superintendent*; HENRY MOORE,
*Deputy Superintendent for Administrative
Services*; ANTHONY POLIZZI,
*Commissioner's Hearing Officer*; WAYNE
JORDAN, *Correctional Lieutenant*; and
KURTIS HOLZAPFEL, *Correction Officer
of the Office of Special Investigation*,

                              Defendants.

No. 17-CV-4445 (KMK)

OPINION AND ORDER

Appearances:

Armando Colon
Staten Island, NY
*Pro Se Plaintiff*

Daphna Frankel, Esq.
Assistant Attorney General of the State of New York
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Pro se Plaintiff Armando Colon ("Plaintiff"), formerly incarcerated at Sullivan

Correctional Facility, filed the instant complaint ("Complaint"), pursuant to 42 U.S.C. § 1983,

against New York Department of Correction & Community Supervision ("DOCCS")

Commissioner Anthony J. Annucci ("Annucci"), Deputy Commissioner Joseph Bellnier ("Bellnier"), Director of Special Housing and Inmate Discipline Donald Venettozzi ("Venettozzi"), Superintendent William F. Keyser ("Keyser"), Deputy Superintendent Edward Burnett ("Burnett"), Deputy Superintendent for Administrative Services Henry Moore ("Moore"), Commissioner's Hearing Officer Anthony Polizzi ("Polizzi"), Correctional Lieutenant Wayne Jordan ("Jordan"), and Correction Officer of the Office of Special Investigation Kurtis Holzapfel ("Holzapfel"). (Compl. (Dkt. No. 2).) Plaintiff alleges that Defendants violated his rights under the First, Fourteenth, and Eighth Amendments by depriving him of due process during various disciplinary proceedings, retaliating against him for filing grievances, and sexually assaulting him. (*See generally* Compl.)[1]

Before the Court is Defendants' Motion To Dismiss the Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Notice of Mot. (Dkt. No. 36).) For the following reasons, Defendants' Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Complaint and the exhibits attached to it, (Compl.), and papers submitted in response to Defendants' request for a pre-motion conference,

[1] The Complaint also lists 18 U.S.C. § 242 and 18 U.S.C. § 1512, but Plaintiff cannot bring claims under these criminal statutes as a private citizen in a civil lawsuit. (Compl. 4.) *See Cato v. Gansberg*, No. 15-CV-5323, 2016 WL 659734, at *2 (E.D.N.Y. Feb. 17, 2016) ("Plaintiff cannot avail himself of those federal criminal statutes, as private persons have no authority to institute criminal prosecutions in the United States."); *Salvador v. New York*, No. 12-CV-7299, 2013 WL 12080930, at *1 (S.D.N.Y. Feb. 19, 2013) ("The Supreme Court has held that a private party does not have standing to file or prosecute a criminal case because 'a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.'" (quoting *Leeke v. Timmerman*, 454 U.S. 83, 86 (1981) (per curiam))), *aff'd*, 550 F. App'x 56 (2d Cir. 2014).

(Letter from Pl. to Court (Dec. 11, 2017) ("Pl.'s Obj. Letter") (Dkt. No. 22)), and are taken as true for the purpose of resolving the instant Motion.[2]  At the time of the events relevant to this Action, Plaintiff was a prisoner incarcerated at Sullivan Correctional Facility ("Sullivan"), housed in "the D-North Housing Block for Sensorial Disable[d] Inmates."  (Compl. 3.)

On the morning of April 16, 2015, while Plaintiff was on callout at the inmate law library, Sergeant Raykoff ordered Correction Officer ("C.O.") Burns to search Plaintiff's cell, "allegedly on the basis of [c]onfidential [i]nformation from [c]onfidential [s]ources."  (Compl. 9 ¶ 1.)  Plaintiff was unable to observe the search, but Burns allegedly discovered contraband, and Plaintiff was charged with disciplinary inmate rule violations, including "Possessing Information relating to another Inmate's Crime, Improper Legal Assistance[,] and Possession of another Inmate's Affidavit."  (*Id.* ¶ 2.)  On April 28, 2015, Plaintiff had a Tier II Disciplinary Hearing before Defendant Jordan, a Hearing Officer, regarding these charges.  (*Id.* ¶ 3.)[3]  Jordan found Plaintiff guilty as charged and imposed 30 days of keeplock confinement and corresponding loss of privileges as punishment.  (*Id.*)  Plaintiff administratively appealed, and on May 6, 2015, the Tier II Hearing Disposition was affirmed by Captain Gary Sipple, Acting Deputy Superintendent for Security Services.  (*Id.* ¶ 4.)

---

[2] The Complaint consists of a standard prisoner complaint form with additional inserted pages and does not follow consistent page numbering.  (Compl.)  Thus, for ease of reference, the Court will cite to the ECF-generated page number in the top-right corner when citing to the Complaint.

[3] New York regulations establish three "Tiers" of disciplinary hearings to adjudicate allegations of rule violations contained in misbehavior reports, structured generally by range of punishment, as follows:
(1) Tier I—violation hearing; provided for in [7 N.Y.C.R.R. § 252];
(2) Tier II—disciplinary hearing; provided for in [7 N.Y.C.R.R. § 253]; and
(3) Tier III—superintendent's hearing; provided for in [7 N.Y.C.R.R. § 254].
7 N.Y.C.R.R. § 270.3; *see also id.* § 252.5 (dispositions at violation hearing); *id.* § 253.7 (dispositions in disciplinary hearing); *id.* § 254.7 (dispositions in superintendent's hearing).

On August 11, 2015, Plaintiff filed an Article 78 Petition in New York Supreme Court seeking review, reversal, and expungement of these disciplinary charges from his disciplinary record. (*Id.*) Specifically, Plaintiff argued in his Petition that Jordan failed to give a written explanation for denying Plaintiff's request for certain witnesses to testify at the hearing. (*Id.* 9–10 ¶ 5.) The Assistant Attorney General defending against Plaintiff's Article 78 Petition, J. Gardner Ryan, read Plaintiff's Tier II Hearing record and concluded that the disposition should be administratively reversed and expunged from Plaintiff's disciplinary record. (*Id.* 10 ¶ 6.) He therefore contacted DOCCS, which agreed to reverse and expunge the disposition, and did not submit a response to Plaintiff's Article 78 Petition. (*Id.* ¶¶ 6–7; Compl. Ex. C.)[4] The Article 78 case was thus closed. (Compl. Ex. B (letter from clerk of New York Supreme Court stating case is closed).) Plaintiff also filed an inmate grievance complaint and ultimately exhausted his administrative remedies regarding the Tier II Hearing deprivations. (Compl. 10 ¶ 8; Compl. Ex. A (Central Office Review Committee Affirmance).)

On the afternoon of May 4, 2005, Sergeant LeConey ordered C.O. Genovese to search Plaintiff's cell. (Compl. 17 ¶ 9.) Genovese allegedly discovered a weapon beneath the foot of Plaintiff's bed and a second weapon hidden in Plaintiff's radiator. (*Id.*) After the weapons were photographed and secured, Genovese wrote a Misbehavior Report charging Plaintiff with violating Disciplinary Rule 113.10 for possessing a weapon. (*Id.*) Plaintiff was transported to a Disciplinary Special Housing Unit ("SHU") the same day, where he was held in a pre-hearing solitary confinement. (*Id.*)

[4] Plaintiff alleges that this means Plaintiff's constitutional rights were violated, but this is a legal conclusion which the Court need not assume to be true. (Compl. 10 ¶ 7.)

The next day, May 5, 2015, Plaintiff received a copy of the Misbehavior Report. (*Id.* ¶ 10.) Plaintiff also met with his assigned Employee Assistant, J. Dewitt ("Dewitt"), in preparation for a Tier III Disciplinary Hearing on the charges contained in the Report. (*Id.*) Plaintiff asked Dewitt to obtain documents and interview several potential inmate witnesses who resided in the D-North housing block and to report back on his findings. (*Id.*) Plaintiff "hoped to learn if any of the [w]itnesses had seen unauthorized persons enter his cell in his absence" and thus "could offer [t]estimony relevant to his [d]efense." (*Id.*) Plaintiff identified inmates Lopez, Rivera, Shobey, Ramos, Romero, Morales, and Braun as potentially relevant witnesses. (*Id.*) However, "[d]espite Plaintiff's clear instructions to . . . Dewitt that he find out what they knew and had observed, [Dewitt] did not report back any substantive findings." (*Id.* at 17–18 ¶ 11.) Instead, Dewitt "advised Plaintiff [that] only some of the [i]nmates had agreed to [t]estify on his behalf," and otherwise "provided no information concerning the [w]itnesses['] knowledge of recent unauthorized entries of Plaintiff's cell." (*Id.* at 18 ¶ 11.)

The same day, the Tier III Hearing commenced before Defendant Moore, the Hearing Officer. (*Id.* ¶ 12.) Plaintiff pleaded not guilty. (*Id.*) He then notified Moore that he was not satisfied with the assistance he received from Dewitt because, "among other failings, Dewitt did not question potential witnesses and report back on his findings as requested," so Plaintiff "could not anticipate the contents of their testimony and could not adequately prepare a defense." (*Id.*) Plaintiff then "outlined the contour of his defense to . . . Moore." (*Id.* ¶ 13.) Specifically, "[h]e denied knowingly possessing the weapon[s] recovered from his cell and asserted that someone unknown to him had planted them there without his knowledge or consent." (*Id.*) He therefore "wanted to establish through inmate witnesses[] that another party had means and opportunity to enter his cell." (*Id.*) Plaintiff further explained that he "knew better than to have [c]ontraband in

his cell" after 40 years in prison. (*Id.*) Moore agreed "that both lines of questioning would be relevant and material to the proceedings" but did not arrange for anyone to interview Plaintiff's requested witnesses and report back to him. (*Id.* at 18–19 ¶ 13.)

Moore elicited testimony from three of the eight individuals Plaintiff had identified to Dewitt: Ramos, Shobey, and Romero. (*Id.* at 19 ¶ 14.) Ramos testified that "Plaintiff's cell was routinely left unsecured in his absence for periods ranging from 5 to 15 minutes," and that "he had regularly seen other prisoners enter Plaintiff's cell while he was not present." (*Id.*) "Shobey also confirmed that Plaintiff's cell was left open for 5 minutes, and sometimes longer, and said "he had seen someone recently enter Plaintiff's cell while he was not there," but could not verify if that person was carrying a weapon. (*Id.*) "Romero similarly testified that the cell was often left unsecured for 5 to 10 minutes and that he had seen other prisoners[] enter Plaintiff's cell during those periods." (*Id.*) However, none of these witnesses was "able to identify any of the unauthorized parties they had seen enter Plaintiff's cell," nor did any have "firsthand knowledge if those parties had been carrying or planting weapons in the cell." (*Id.*) Moore then took testimony from C.O. Jackson, who stated that "Plaintiff's cell was generally left open for 3 to 5 minutes during movement periods," and C.O. Bradley, who testified that cells on the D-North Unit are generally opened "just long enough for everyone to start migrating down to the Sally Port for [e]xit" during movement periods, which he estimated to be about 30 seconds to a minute. (*Id.* at 19–20 ¶ 15.)

As the Hearing drew to a close, Moore asked Plaintiff if he wished to call any more witnesses. (*Id.* at 20 ¶ 16.) "Plaintiff stated [that] he still wanted inmates Lopez, Braun, Rivera, and Morales, but was under the impression they were refusing to testify, because that is what . . . Dewitt[] had told him." (*Id.*) "Moore admitted he knew nothing about any witness refusals, but

was denying each witness just the same." (*Id.*) As to Lopez, Moore said, "There is nothing on here that says he agrees or [does] not agree[], but I am not going to call him anyway." (*Id.*) As to Braun, Rivera, and Morales, Moore "similarly said he didn't know of their refusals to testify, but denied those witnesses, too." (*Id.*) Moore also denied another witness, inmate Rosario, who "apparently had agreed to testify." (*Id.*) Additionally, "Moore preemptively denied any other witnesses Plaintiff might have wanted to call," stating "I'm not going to call anymore, so any other inmate witnesses I will deny unless for other reasons, unless there's another reason." (*Id.* ¶ 17.) Plaintiff objected, arguing that his requested witnesses were material to his defense and because he "had not been provided with any reasons for" Moore's decision to deny their testimony and no reasonable effort had been made to interview his witnesses. (*Id.*) Moore then closed all testimony and adjourned the Hearing to render his disposition. (*Id.* at 20–21 ¶ 17.) "Plaintiff learned that his witnesses had been denied as redundant." (*Id.* at 21 ¶ 17.)

On May 27, 2015, Plaintiff was found guilty of the weapon charge and received a penalty of 365 days of punitive segregation in SHU and corresponding loss of privileges. (*Id.* ¶ 18.) Moore issued a written disposition stating that "[h]e relied, in part, upon testimony from officers Bradley and Jackson that Plaintiff's cell 'is closed as soon as he is leaving the unit.'" (*Id.*) Further, Moore wrote that "he did not believe the weapons could have been placed in Plaintiff's cell in 'a very short amount of time['] as he claimed." (*Id.*) Plaintiff timely appealed the Hearing Disposition. (*Id.* ¶ 19.) On July 10, 2015, Defendant Venettozzi modified the Disposition to 306 days of Disciplinary SHU and 60 days suspended. (*Id.*) Plaintiff's counsel submitted a supplemental administrative appeal and Venettozzi further reduced the penalty imposed to 245 days of Disciplinary SHU and 60 days suspended. (*Id.*)

On August 25, 2015, Plaintiff filed an Article 78 Petition in New York Supreme Court to reverse and expunge the Disposition of his Tier III hearing. (*Id.* at 21–22 ¶ 20.) The Petition alleged that Plaintiff had been deprived of his right to Employee Assistance and to call witnesses. (*Id.* at 22 ¶ 20.) The Petition was dismissed. (*Id.*) However, prior to the New York court's judgment, Plaintiff filed an Inmate Grievance Complaint regarding his dissatisfaction with his Tier III Assistance. (*Id.*) The Central Office Review Committee responded that Plaintiff's concerns had been appropriately addressed and that it found insufficient evidence of malfeasance by staff. (*Id.*; *id.* Ex. D.) Plaintiff also filed a similar Grievance regarding his dispute of the weapons charges. (*Id.* at 22 ¶ 20) Plaintiff alleges that he exhausted all administrative remedies on October 5, 2016. (*Id.*)

On March 3, 2016 at approximately 10:10 am, Plaintiff was served with an Inmate Misbehavior Report ("MBR") charging him with the following Inmate Rule Violations: 102.10 Threats, 104.13 Creating a Disturbance, and 107.11 Harassment. (*Id.* at 29 ¶ 21.) The author of the report was Defendant C.O. Holzapfel. (*Id.* ¶ 22.) He wrote:

> On the above [d]ate and approximate [t]ime, I[,] C.O Holzapfel[,] escorted ORC Alexander to deliver a SDP Talking Book to [Plaintiff] . . . who was [k]eep-locked pending a [h]earing, after delivering the item to [Plaintiff], the inmate proceeded to tell ORC Alexander that he will be calling her as a witness for his [h]earing. When prompted as to why [Plaintiff] became irate and started screaming, causing my porters to stop work and take notice, [Plaintiff] was screaming ["]because this motherfucker here wants to fuck with me. He don't know who he's fucking with,["] pointing towards me and yelling, ["]Believe me you don't want this problem, it's coming.["] [Plaintiff] re[p]lied "You know what's coming," referring to earlier threats he . . . has made against my life. My area supervisor Sergeant Beach was notified of the incident.

(*Id.* ¶¶ 22–23.) On April 8, 2016, at approximately 4:00 pm, Plaintiff met with his assigned Employee Assistant, Leslie Fishman, at SHU. (*Id.* ¶ 24.)

On May 16, 2016, before Plaintiff's release from SHU, Captain Sipple authorized an Administrative Segregation Recommendation against Plaintiff. (*Id.* at 42 ¶ 48.)[5] The Recommendation alleged that Holzapfel feared his life would be in danger if Plaintiff returned to General Population upon his release from SHU. (*Id.*) The Recommendation further alleged that confidential informants had reported that Plaintiff made threats against Holzapfel and had been actively attempting to acquire a weapon to assault him. (*Id.* ¶ 49.) Sipple concluded that Plaintiff's release from SHU to General Population would place Holzapfel's life in jeopardy, and thus recommended that Plaintiff be confined under Administrative Segregation. (*Id.*)

On May 23, 2016, an Administrative Segregation Hearing commenced before Defendant Burnett, who was acting as Hearing Officer. (*Id.* ¶ 50.) After the Recommendation was read into the record, "Plaintiff sought to clarify the burden of proof at the proceeding." (*Id.*) Specifically, he asked Burnett "if he would be required to prove that there was no need for his confinement[,] which [Burnett] confirmed." (*Id.*) Plaintiff then objected that Burnett "had impermissibly shifted the burden of proof from [DOCCS] to [Plaintiff]." (*Id.*) "Throughout the Hearing, both Plaintiff and numerous witnesses confirmed that a personal conflict had existed between Plaintiff and Holzapfel over the [preceding] months." (*Id.* at 42–43 ¶ 51.) Specifically, Plaintiff testified that Holzapfel had "relentlessly harassed and threatened him leading him to write numerous Grievances and Complaints." (*Id.* at 43 ¶ 51.) He also testified that Holzapfel "authored false and retaliatory Misbehavior Reports against him." (*Id.* ¶ 52.) "Plaintiff expressly and repeatedly denied issuing any threats to [Holzapfel] or attempting to procure a

[5] "Ad Seg" removes an inmate from the general population when he "pose[s] a threat to the safety and security of the [prison] facility." 7 N.Y.C.R.R. § 301.4(b). Ad Seg terms are open-ended—"[a]t any time when deemed appropriate [by DOCCS], an inmate may be evaluated and recommended for return to general population." *Id.* § 301.4(e)

weapon," testifying that "his only intended recourse in the conflict was through [j]udicial means." (*Id.*) "No evidence was adduced at the Hearing to even suggest that Plaintiff presented a generalized threat to the [s]afety or [s]ecurity of the [f]acility." (*Id.*; *see also id.* at 45 ¶ 61 (same).)

The Hearing concluded on June 17, 2016. (*Id.* at 43 ¶ 53.) Burnett issued a written disposition invoking Administrative Segregation. (*Id.*) He concluded that "the relationship between Plaintiff and . . . Holzapfel ha[d] deteriorated to such a degree that a physical altercation . . . would be more probable[] if Plaintiff returned to General Population, and that [Holzapfel's] well-being would be in danger." (*Id.*) Plaintiff contends that Burnett "plainly applied the wrong burden of proof in this proceeding" by stating that "Plaintiff would be required to prove that his confinement to Administrative Segregation was not necessary" and, upon Plaintiff's objection, that Plaintiff must "show that he would not pose a threat to . . . Holzapfel if released to General Population." (*Id.* at 44 ¶ 56.) In other words, Plaintiff contends that Burnett was not an impartial hearing officer. (*Id.* ¶ 57.)[6] Additionally, because "the sole basis" for his Segregation was "the individualized threat [Plaintiff] allegedly poses to a single [o]fficer," Plaintiff contends that "[a]ny risk that [his] presence in General Population might present . . . could be immediately and permanently solved by his transfer to another facility." (*Id.* at 45 ¶ 62.) Plaintiff alleges that "[a] robust body of [s]cientific study has confirmed that extended periods of extreme isolation present [a] myriad [of] dangers to an individual's physical and psychological well-being." (*Id.* ¶ 64; *see also id.* at 46 ¶ 65 (same).)

[6] To the extent Plaintiff alleges that the hearing violated certain New York laws and regulations, this is a legal conclusion the Court need not consider true. (Compl. 43–45 ¶¶ 54–55, 57–60, 63)

Beginning on June 1, 2016, Plaintiff was confined to Administrative Segregation and compelled to take medications for depression and panic attacks in order to deal with his conditions of solitary confinement. (*Id.* at 46 ¶ 66.) Plaintiff alleges that DOCCS has "failed to provide a meaningful periodic [r]eview process that fairly considers Plaintiff's continued placement in Administrative Segregation," as required by DOCCS Directive 4933. (*Id.* ¶ 67.) Specifically, the reviews have been "merely perfunctory" and a "sham." (*Id.* ¶ 68.) DOCCS officials "have shown a factual lack of good faith and pretexutality, regarding the nature and adequacy of the [r]eviews," although Plaintiff recognizes that DOCCS "can rely on purely subjective evaluations and predictions of future behavior." (*Id.* at 47 ¶ 69.) However, Plaintiff also alleges that he received a form indicating such a review occurred on December 7, 2016. (*Id.* at 46 ¶ 68.) This form, attached to the Complaint, states that a determination was made to keep Plaintiff in Administrative Segregation because "Holzapfel remains working at Sullivan" and "[a]ny release of [Plaintiff] would jeopardize the officer's well being" in light of "the threats toward" him. (Compl. Ex. P; *see also* Compl. Ex. Q (upholding Administrative Segregation in a review form dated February 1, 2017); Compl. 51 (stating, on September 8, 2018, that "[y]our Administrative Segregation status continues to be reviewed periodically to determine the need for such assignment," and "[a]t this time, your present placement appears appropriate.").) However, the alleged reason listed for why Segregation was initially deemed appropriate included credible information that Plaintiff was actively conspiring to have another inmate harm Holzapfel, which was not supported by the testimony of DOCCS officers at the hearing. (*Id.* at 47 ¶¶ 70–71.) Plaintiff therefore alleges that the DOCCS staff who conducted the review "embellished their unidentifiable inmate to the non-existing conspiracy to harm . . . Holzapfel in order to support Plaintiff's continued confinement." (*Id.* ¶ 72.)

Plaintiff claims that he never threatened Holzapfel with physical harm, "but merely warned him that if he continued to sexual[ly] abuse and harass Plaintiff with bogus Misbehavior Reports in retaliation for Grievance[s] Plaintiff filed against . . . Holzapfel, that Plaintiff will take legal action against him in [f]ederal [c]ourt." (*Id.* at 48 ¶ 73.) Holzapfel "said he did not care because the Attorney General will protect him against any lawsuit filed against him." (*Id.*) Prison officials have permitted Holzapfel to write "false and/or bogus Misbehavior Reports against Plaintiff and other [s]ensorial[ly] [d]isabled [i]nmates" living in D-North Housing Block. (*Id.* ¶ 74.) Additionally, on March 1, 2016, Holzapfel "sexually abused Plaintiff to satisfy his homosexual proclivities by fondling Plaintiff's private parts under the pretext" that he "was conducting a body pat frisk for suspicion of contraband." (*Id.* at 49 ¶ 75.) Specifically, "Holzapfel placed his bare hands underneath Plaintiff's undershorts[,] gro[]ping Plaintiff's penis and testicles." (*Id.*) "When Plaintiff protested . . . Holzapfel[] told Plaintiff to shut-up or get written-up for refusing a body [p]at [f]risk and [d]isobeying a [d]irect [o]rder." (*Id.*)

Plaintiff filed a Grievance against Holzapfel for sexual abuse with the Inmate Grievance Program Supervisor, who logged it under "SUL-22571-16." (*Id.* ¶ 76.)[7] However, the Grievance "was closed in accordance with [DOCCS] Directive # 4040, [§] 701.3(i), allegedly because the allegations of [s]exual [a]buse were being investigat[ed]" by the OSI. (*Id.*; *see also* Compl. Ex. N (same); *see also* Compl. Ex. O (same).) Plaintiff was never interviewed regarding the March 1, 2016 sexual abuse incident. (*Id.* at 49 ¶ 77.) As a result of the OSI's delay in investigating, other potential inmate witnesses may have been paroled or transferred to other correctional facilities. (*Id.*) Plaintiff alleges that prison officials "elected to look the other way

[7] Plaintiff also filed a Grievance with respect to the filing of false Misbehavior Reports, but it was denied as untimely. (Compl. Ex. N.)

and cover-up . . . Holzapfel's continued abusive conduct towards [s]ensorial[ly] [d]isabled [i]nmates." (*Id.* ¶ 78.)

As a result of these incidents, Plaintiff requests compensatory and punitive damages and an award of attorney's fees and costs. (*Id.* at 6, 50.)[8]

B. Procedural Background

Plaintiff filed the Complaint and a request to proceed in forma pauperis ("IFP") on June 12, 2017. (Compl.; Dkt. No. 1.) Plaintiff was granted IFP status on June 19, 2017, (Order Granting IFP Application (Dkt. No. 4)), and the Court issued an Order of Service directing service on Defendants on August 11, 2017, (Order of Service (Dkt. No. 6)). On November 13, 2017, Defendants filed a pre-motion letter indicating the grounds on which they would move to dismiss the Complaint. (Letter from Daphna Frankel, Esq. to Court (Nov. 13, 2017) (Dkt. No. 17).) The Court memo endorsed the letter with a briefing schedule on November 28, 2017. (Dkt. No. 19.) However, Plaintiff filed a letter responding to Defendants' pre-motion letter on December 14, 2017, (Pl.'s Obj. Letter), which the Court memo endorsed reminding Plaintiff of the briefing schedule already set and noting that "Plaintiff should include all arguments in response to the motion" in his opposition rather than file another pre-motion letter, (Dkt. No. 23).

Plaintiff also filed an application for appointment of pro bono counsel on November 15, 2017, citing difficulty with obtaining inmate legal assistance at Sullivan Correctional Facility despite his sensorial disabilities. (Application for Appointment of Counsel (Dkt. No. 18).) At the Court's direction, (Dkt. Nos. 21, 25), Defendants filed an opposition to Plaintiff's request, (Letter from Daphna Frankel, Esq. to Court (Dec. 18, 2017) (Dkt. No. 24); Decl. of Jessica

[8] The Court denies Plaintiff's request for attorney's fees, because "a pro se litigant who is not a lawyer is not entitled to attorney's fees." *Kay v. Ehrler*, 499 U.S. 432, 435 (1991) (italics omitted).

Sircable in Opp'n to App. For Counsel (Dkt. No. 28).) Plaintiff responded to Defendant's letter and requested an extension of time to prepare a rebuttal, (Letter from Plaintiff to Court (Jan.3, 2018) (Dkt. No. 29); Letter from Plaintiff to Court (Jan. 5, 2018) (Dkt. No. 30)), which he filed on January 17, 2018, (Resp. to Defs.' Opp'n (Dkt. No. 32)). However, on January 24, 2018, Plaintiff filed a change of address form which listed an address not in a prison. (Dkt. No. 35.) The Court therefore directed the Parties to inform the Court "whether Plaintiff is still incarcerated," and "[i]f Plaintiff is no longer incarcerated at Sullivan, Plaintiff should explain . . . why the Court should not [deny] his Motion to Appoint Counsel as moot." (Dkt. No. 40.) On February 9, 2018, Plaintiff wrote to the Court confirming he had been released on parole, but renewing his request for counsel, now arguing that he no longer had access to the legal assistance provided in prison; alternatively, he requested a 60 day extension of time to obtain representation. (Letter from Pl. to Court (Feb. 9, 2018) (Dkt. No. 41); *see also* Dkt. No. 43 (same).) On February 28, 2018, the Court denied Plaintiff's request for counsel without prejudice "should the circumstances change." (Dkt. No. 45)

Meanwhile, Defendants filed the instant Motion To Dismiss and accompanying papers on January 30, 2018. (Not. of Mot.; Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 37); Decl. of Daphna Frankel, Esq. in Supp. of Mot. To Dismiss ("Frankel Decl.") (Dkt. No. 38); Not. of Local Rule 12.1 (Dkt. No. 39).) On February 25, 2018, the Court granted Plaintiff a sixty-day extension of time to respond to the Motion To Dismiss, but stated "there will be no more extensions." (Dkt. No. 44.) Plaintiff requested an additional 30 day extension on March 28, 2018, (Letter from Pl. to Court (March 28, 2018) (Dkt. No. 46)), which the Court denied, (Dkt. No. 47). On May 8, 2018, Defendants requested that the Court deem the Motion fully briefed, (Letter from Daphna Frankel, Esq. to Court (May 8, 2018) (Dkt. No. 49)), which

the Court granted, (Dkt. No. 50).  However, on May 21, 2018, Plaintiff filed a motion for leave

to file a proposed amicus curiae brief.  (Dkt. No. 53.)  Defendants opposed the motion.  (Letter

from Daphna Frankel, Esq. to Court (June 20, 2018) (Dkt. No. 55).)  The Court then denied

Plaintiff's motion because the proposed amicus brief was "irrelevant to the pending Motion [T]o

Dismiss (and this Action generally)," which "does not concern the accommodations Plaintiff was

allegedly denied at Sullivan Correctional Facility" and "[i]n any event, Plaintiff is no longer

incarcerated there, so those claims are moot."  (Dkt. No. 56.)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(alteration and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "Nor does a

complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.*

(alteration and internal quotation marks omitted).  Instead, a complaint's "[f]actual allegations

must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of

facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege

"only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff

has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint

must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint

states a plausible claim for relief will . . . be a context-specific task that requires the reviewing

court to draw on its judicial experience and common sense.  But where the well-pleaded facts do

not permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted)

(second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a

notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but

it does not unlock the doors of discovery for a plaintiff armed with nothing more than

conclusions.").

      In considering Defendants' Motion To Dismiss, the Court is required to "accept as true

all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94

(2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same).  And, the

Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot.

Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*,

699 F.3d 141, 145 (2d Cir. 2012)).  Where, as here, a plaintiff proceeds pro se, the Court must

"construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it]

suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal

quotation marks omitted).  However, "the liberal treatment afforded to pro se litigants does not

exempt a pro se party from compliance with relevant rules of procedure and substantive law."

*Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted).

      Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its

consideration to facts stated on the face of the complaint, in documents appended to the

complaint or incorporated in the complaint by reference, and to matters of which judicial notice

may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).  However, when the complaint is pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[] either possessed or knew about and upon which [he or she] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).  Finally, the "failure to oppose Defendants' [M]otion [T]o [D]ismiss does not, by itself, require the dismissal of [Plaintiff's] claims." *Leach v. City of New York*, No. 12-CV-2141, 2013 WL 1683668, at *2 (S.D.N.Y. Apr. 17, 2013).  Rather, "the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law." *McCall v. Pataki*, 232 F.3d 321, 322–23 (2d Cir. 2000).

    B.  Analysis

    Defendants move to dismiss the Complaint, arguing that Plaintiff failed to plead the personal involvement of certain Defendants and failed to state a claim, and Defendants are entitled to qualified immunity.  (*See* Defs.' Mem.)  The Court will address each argument separately.

1. Personal Involvement

Defendants Annucci, Bellnier, Keyser, Venettozzi, and Polizzi argue that the Complaint should be dismissed against them because they were not personally involved in the alleged constitutional violations. (Defs.' Mem. 20–23.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (italics and internal quotation marks omitted) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). In other words, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Therefore, Plaintiff must plausibly allege that Defendants' actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

a. Annucci, Bellnier, Keyser, Polizzi

Plaintiff has failed to plausibly allege the personal involvement of Annucci, Bellnier, Keyser, and Polizzi. Plaintiff's claims relate to his Tier II Hearing, Tier III Hearing,

Administrative Segregation Hearing, the allegedly false Misbehavior Reports filed against him, Holzapfel's sexual assault of him, and the events leading up to and following those events. The Complaint contains no allegations whatsoever that these Defendants were involved in, aware of, or somehow permitted these incidents to take place.[9] Indeed, their names and positions appear nowhere in the Complaint, other than in the caption. (Compl. 1–3.) This alone is grounds to dismiss the claims against them. *See Davis v. Cheverko*, No. 16-CV-4034, 2017 WL 6397749, at *4 (S.D.N.Y. Dec. 13, 2017) (collecting cases); *Perkins v. City of New York*, No. 14-CV-3779, 2017 WL 1025987, at *2 (S.D.N.Y. Mar. 15, 2017) ("Where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted." (alteration and internal quotation marks omitted)). Similarly, the exhibits attached to the Complaint do not indicate that these Defendants were involved in any of the conduct at issue in this Action. Some exhibits do list the names of some of them, but only in a letterhead or recipient capacity rather than as participants in the allegedly objectionable events and decisions. (*See* Compl. Ex. I (listing Annucci and Bellnier in letterhead and Keyser as recipient of memorandum regarding the reversal of the March 17, 2016 hearing disposition); Compl. at 51 (noting that Keyser was CC'd on September 8, 2018 letter from Venettozzi to Plaintiff); Compl.

[9] Plaintiff alleges in a letter to the Court that he "wrote letters of protest and complaints to [D]efendants Annucci, Bellnier, Venettozzi and Keyser who exhibited deliberate indifference to the rights of [P]laintiff . . . by failing to act on information indicating that unconstitutional acts were occurring" and that they "were grossly negligent in their failure to train or supervise subordinates who committed the wrongful acts under their management." (Pl.'s Obj. Letter 3.) This conclusory statement, which merely parrots two of the personal involvement categories verbatim, is insufficient to plausibly allege personal involvement. *See Samuels v. Fischer*, 168 F. Supp. 3d 625, 636 (S.D.N.Y. 2016) ("Second Circuit law has long taught that, even within the context of the *Colon* framework, merely reciting the legal elements of a successful § 1983 claim for supervisory liability does not meet the plausibility pleading standard." (alterations and internal quotation marks omitted)).

Exs. N, O, R, S (listing Annucci in letterhead of Grievance response as DOCCS Commissioner).) One of the exhibits, a February 2, 2012 memorandum to all DOCCS Superintendents regarding a "Pilot Incentive Program for Administrative Segregation Inmates Subject to 60 Day Central Office Review," is from Bellnier, but it merely describes a pilot program long pre-dating Plaintiff's Administrative Segregation which Plaintiff does not allege he qualified for or was denied participation in. (Compl. Ex. M.) This memorandum does not indicate that Bellnier is the architect of the Administrative Segregation program or that he oversees decisions to impose or review Segregation; indeed, it indicates that a review committee implements the program and that "[t]he DSS will be responsible" for overseeing it. (*Id.*) Simply put, these Defendants cannot be held personally liable for constitutional violations merely "because [they] w[ere] in a high position of authority in the prison system." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (same). Therefore, the Court dismisses Plaintiff's claims against Annucci, Bellnier, Keyser, and Polizzi.

b. Venettozzi

With respect to Defendant Venettozzi, the Complaint contains one allegation against him: Venettozzi modified Plaintiff's Tier III disposition on appeal, first to 306 days of SHU and 60 days suspended, and then further to 245 days of SHU and 60 days suspended. (Compl. 21 ¶ 19; *see also* Compl. Ex. F (notifying Plaintiff of appeal decision rendered in appeal of Tier III Hearing disposition).) It is an open question in the Second Circuit "whether an appeal officer may be held liable for failing to reverse the outcome of an allegedly unconstitutional disciplinary hearing." *Lebron*, 2017 WL 365493, at *8; *see also Ortiz v. Russo*, No. 13-CV-5317, 2015 WL 1427247, at *13 (S.D.N.Y. Mar. 27, 2015) ("Courts within this Circuit are split as to whether a prison official who simply denies an inmate's administrative appeal from a disciplinary hearing

can be held liable under § 1983.”). This Court, however, has already expressed skepticism with the cases “holding that an appeal officer may not be held liable for failure to correct a procedural due process error below,” explaining:

> Courts dismissing claims against appeal officers for failing to correct procedural violations do so on the belief that the Second Circuit intended to limit the second category in *Colon* to “cases involving continuing unconstitutional prison conditions that the warden may be proven or assumed to know about, and a refusal by the warden to correct those conditions.” *Thompson v. New York*, No. 99-CV-9875, 2001 WL 636432, at *7 (S.D.N.Y. Mar. 15, 2001); *see also Koehl v. Bernstein*, No. 10-CV-3808, 2011 WL 2436817, at *10 (S.D.N.Y. June 17, 2011) (“The reference in case law to an official who fails to remedy a violation logically applies only to ongoing, and therefore correctable, constitutional violations—not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded.”), *adopted by* 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011). This inference is not derived from any language in *Colon*, which did not even involve an allegation under this category. These courts, instead, reason that “were it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff’s grievance will have been passed upon by the Superintendent.” *Koehl*, 2011 WL 2436817, at *10 (alteration omitted). But this observation, which addresses only grievances filed by an inmate and not disciplinary proceedings initiated by the correction institution, proves too much. It is axiomatic, after all, that a hearing officer may be sued for violating an inmate’s procedural due process rights. *See, e.g., Ortiz v. McBride*, 380 F.3d 649, 654–55 (2d Cir. 2004). There is no principled reason why the appeal officer, who has access to the same information as the hearing officer and is empowered to correct errors of the hearing officer, should not be held to the same standards of liability as the hearing officer, or why it should offend justice to so hold.

*Lebron*, 2017 WL 365493, at *9.

However, Venettozzi argues that, because of this split among the district courts in the Second Circuit on this issue, he is entitled to qualified immunity. (Defs.’ Mem. 24–25.) “The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). In other words, qualified immunity shields a defendant from

standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted). "Although [the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the . . . constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal quotation marks omitted). In other words, "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* at 1153 (internal quotation marks omitted); *see also Doninger v. Niehoff*, 642 F.3d 334, 345–46 (2d Cir. 2011) (same). This doctrine extends not only to the contours of the constitutional right allegedly violated, but also to "the specific supervisory liability theory under which [the plaintiff] wishes to hold [the defendant] liable." *Poe v. Leonard*, 282 F.3d 123, 135 (2d Cir. 2002).

Consistent with its prior opinions, the Court agrees that Venettozzi is entitled to qualified immunity for his affirmance of Plaintiff's Tier III Hearing disposition:

> As th[e] line of [conflicting] cases demonstrates, the law in this area is unsettled, and thus it cannot be said that every reasonable official would have known that failure to correct a procedural due process error on appeal violates an inmate's constitutional rights.

*Lebron*, 2017 WL 365493, at *9 (citation and internal quotation marks omitted). In other words, taking the allegations in the Complaint as true, Venettozzi knew only that he was affirming Plaintiff's disciplinary disposition—although reducing the punishment—despite the fact that it was alleged to have been procedurally erroneous. But, because Plaintiff alleges no facts showing that Venettozzi knew or reasonably should have known that that this action violated Plaintiff's

due process rights, and the law is not so clear that a reasonable appeal officer would have known that, Venettozzi is entitled to qualified immunity. *Id.* Other judges in this District have reached the same conclusion. *See, e.g.*, *Constant v. Annucci*, No. 16-CV-3985, 2018 WL 1684411, at *6 (S.D.N.Y. Apr. 5, 2018) ("Defendant is entitled to qualified immunity because, given the uncertainty within the Circuit, it cannot be said that every reasonable official would have understood that affirming a disciplinary hearing containing procedural due process violations would violate an inmate's constitutional rights." (internal quotation marks omitted)); *Richardson v. Williams*, No. 15-CV-4117, 2016 WL 5818608, at *3 (S.D.N.Y. Oct. 5, 2016) (same). Because the Court has discretion to consider the applicability of a qualified immunity defense before determining whether Plaintiff has stated a claim, *see Pearson*, 555 U.S. at 236, and because application of the defense is appropriate at the motion to dismiss stage if "the facts supporting the defense appear[] on the face of the complaint," *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004), the Court grants Venettozzi's Motion To Dismiss the claims against him on qualified immunity grounds.

2. Due Process Claims

Construing the Complaint liberally, Plaintiff raises Fourteenth Amendment procedural due process claims against Jordan, Moore, and Burnett for their decisions in his Tier II, Tier III, and Administrative Segregation Hearings, respectively. The Court will address each claim separately.

"[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (alteration in original) (internal quotation marks omitted). The Supreme Court has held that inmates retain due process rights in

prison disciplinary proceedings. *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment). However, the Supreme Court has clarified that "[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The Second Circuit "read[s] *Sandin* to require that [courts] look to actual punishment in making this determination." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (internal quotation marks omitted). Factors relevant to this determination include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement." *Id.* (internal quotation marks omitted); *see also Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir. 1999) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." (citation omitted)).

Regarding the process an inmate is due, a disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). "[P]rison discipline decisions affecting an inmate's liberty interest cannot be 'imposed arbitrarily' but must be 'supported by some evidence in the record.'" *Sira v. Morton*, 380 F.3d 57, 76 (2d Cir. 2004) (quoting *Superintendent v. Hill*, 472 U.S. 445, 454 (1985)). "Judicial review of this 'some evidence' standard is narrowly focused;" "it 'does not require examination of the entire record, independent assessment of the

credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.'" *Id.* (quoting *Hill*, 472 U.S. at 455–56). Finally, "the Second Circuit has said that its 'conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say, with . . . utter certainty . . . , how he would assess evidence he has not yet seen.'" *Rahman v. Acevedo*, No. 08-CV-4368, 2011 WL 6028212, at *7 (S.D.N.Y. Dec. 5, 2011) (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)).

a. Jordan

The Complaint alleges that, after Plaintiff's Tier II Disciplinary Hearing, Jordan found Plaintiff guilty of the charged inmate rule violations—including "Possessing Information relating to another Inmate's Crime, Improper Legal Assistance[,] and Possession of another Inmate's Affidavit"—and found Plaintiff guilty as charged and imposed 30 days of keeplock confinement and correspondent loss of privileges. (Compl. 9 ¶¶ 2–3.) Plaintiff alleged in his Article 78 Petition that Jordan did not provide a written explanation for refusing to let certain witnesses testify for Plaintiff. (*Id.* 9–10 ¶ 5). Furthermore, the offending inmate affidavit confiscated from Plaintiff's cell was one Plaintiff hoped to use "in a contemplated lawsuit against [Sullivan] staff for failure to process" his grievances. (Pl.'s Obj. Letter 3.) At the hearing, Jordan allegedly stated on the record that Sullivan "staff were aware of [P]laintiff's legal endeavors to sue DOCCS employees and that they know how to deal with inmates like [him]," which Plaintiff believes indicates there was "a conspiratorial plot" among Sullivan employees to retaliate against him for filing grievances. (*Id.*)[10]

[10] Although these facts are insufficient to state a due process claim, they could be sufficient to allege a First Amendment retaliation or conspiracy claim. Should Plaintiff choose to file an Amended Complaint, he should specifically allege what action, if any, Jordan took that

However, even assuming that these actions deprived Plaintiff of due process, Plaintiff possessed no liberty interest implicating the Fourteenth Amendment at the Tier II Hearing, because he was sentenced to only thirty days in keeplock and corresponding loss of privileges. The Supreme Court in *Sandin* found that a 30-day disciplinary "segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." 515 U.S. at 486. The Second Circuit has thus "affirmed dismissal of due process claims . . . in cases where the period of time spent in [segregated confinement] was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65–66. Plaintiff's 30-day keeplock confinement alone is insufficient to create a liberty interest triggering due process protections. *See Thomas v. DeCastro*, No. 14-CV-6409, 2018 WL 1322207, at *7 (S.D.N.Y. Mar. 13, 2018) ("[T]he 30-day confinement is right at the cut-off suggested by the Second Circuit for a presumptively typical confinement." (alterations and internal quotation marks omitted)); *Martin v. Oey*, No. 16-CV-717, 2017 WL 9511174, at *6 (N.D.N.Y. July 19, 2017) ("Courts have consistently held that SHU or keeplock confinement under ordinary conditions for 30 days does not rise to a level sufficient to establish a due process claim."), *adopted*, 2017 WL 4174798 (N.D.N.Y. Sept. 20, 2017); *Pampalone v. Young*, No. 95-CV-2348, 1996 WL 511569, at *3 (S.D.N.Y. Aug. 7, 1996) ("The decisions in the Second Circuit are unanimous that keeplock or SHU confinement of 30 days or less in New York prisons is *not* an 'atypical or significant hardship' under *Sandin*."). Plaintiff also does not allege any facts

was in retaliation for Plaintiff's filing of grievances and who, if anyone, he agreed to act in concert with to do so. *See Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (listing elements of First Amendment retaliation claim); *Ciambriello v. County of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) (stating elements of a § 1983 conspiracy claim).

suggesting that he was exposed to any conditions of confinement more harsh than typical keeplock; indeed, he cites only the loss of unspecified privileges. *See Thomas*, 2018 WL 1322207, at *7 (noting that the plaintiff "failed to make any allegations regarding the conditions of his confinement," and thus failed to demonstrate a liberty interest); *see also Hynes v. Squillace*, 143 F.3d 653, 658–59 (2d Cir. 1998) ("Given plaintiff's failure of proof, including his failure to allege any unusual conditions, the short span of the confinement at issue, and previous decisions (including *Sandin*) holding that comparable periods [of 21 days] and conditions of segregation do not amount to a deprivation of a liberty interest, we think the district court sufficiently articulated the factual predicates underlying its liberty interest analysis."). The Court therefore grants Jordan's Motion To Dismiss the due process claim against him.

b. Moore

Plaintiff alleges that Moore violated his procedural due process rights during the Tier III hearing by not letting Plaintiff call additional inmate witnesses in support of his defense that another inmate planted the weapons in his cell. (Compl. 18–21.) The Supreme Court has explained that, although an inmate has a right "to call witnesses and present documentary evidence in his defense," it must be "balance[d] . . . against the needs of the prison." *Wolff*, 418 U.S. at 566. Specifically, the Court explained:

> Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases.

*Id.*; *see also Jamison v. Fischer*, 617 F. App'x 25, 27 (2d Cir. 2015) (same). Thus, "a prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity," *Kingsley v.*

*Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991), or "futility," *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) (per curiam). This includes situations in which "a witness will not testify if called." *Id.*

Here, Plaintiff was permitted to call three of his eight identified witnesses—Ramos, Shobey, and Romero—who all testified favorably for Plaintiff. (Compl. 19 ¶ 14.) Plaintiff also wished to call Lopez, Braun, Rivera, and Morales as witnesses, but told Moore that he "was under the impression they were refusing to testify, because that is what . . . Dewitt[] had told him." (*Id.* at 20 ¶ 16.) "Moore admitted he knew nothing about any witness refusals," but denied each witness. (*Id.*)[11] Moore argues that he was "entitled to rely" on Dewitt's representation that these witnesses would not testify, and thus he reasonably concluded it would be futile to call them. (Defs.' Mem. 8.) Moore cites no cases in support of this argument, but it is not entirely clear under Second Circuit caselaw whether Moore was required to inquire further whether these witnesses would actually refuse to testify if called. *Compare Smith v. Graham*, 684 F. App'x 13, 15 (2d Cir. 2017) ("[T]he inmate had submitted a form stating that he refused to testify because he had not seen anything.") (citing *Silva*, 992 F.2d at 22), *Finney v. Coughlin*, 2 F. App'x 186, 190 (2d Cir. 2001) (distinguishing *Silva*'s futility holding from the instant case, where the defendant "accepted . . . information from [the] plaintiff's hearing assistant that [the putative witness] refused to testify"), *with Jamison*, 617 F. App'x at 27 (finding "no federal law that clearly alerted hearing officers that, in reaching a reasonable conclusion of futility, they could not rely on" allegedly "incomplete 'Witness Refusal Forms' to make [a] decision, rather

[11] Moore also precluded the testimony of another inmate, Rosario, who "apparently had agreed to testify," but Plaintiff does not argue that he requested this witness, that his testimony was helpful to his defense, or that he found his exclusion objectionable. (Compl. 20 ¶ 16.) And, perhaps more importantly, Plaintiff does not allege that Moore knew Rosario had agreed to testify.

than conducting an independent inquiry of the requested witnesses"); *Rodriguez v. Ghoslaw*, No. 98-CV-4658, 2001 WL 755398, at *10 (S.D.N.Y. July 5, 2001) (citing *Silva* for the proposition that the hearing officer did not violate the plaintiff's due process rights by denying his right to call a witness when the plaintiff "apparently indicated he could not procure [the witness's] testimony," even though he "failed to secure [the witness's] written refusal to testify").[12]

The Court need not decide this issue, because Moore proffered another reason for denying Plaintiff's remaining witnesses: redundancy. Plaintiff alleges that Moore denied them and "preemptively denied any other witnesses Plaintiff might have wanted to call," unless Plaintiff could provide "another reason" for calling them. (Compl. 20 ¶¶ 16–17.) Plaintiff also alleges that he "learned that his witnesses had been denied as redundant" that same day, although it is unclear if this happened at the Hearing or after Moore adjourned it to render his disposition. (*Id.* at 21 ¶ 17.)[13] Although Plaintiff objected to Moore's decision, contending that these witnesses were material to his defense, (*id.* at 20 ¶ 17), Moore's decision was reasonable in light

[12] The Court recognizes these are non-precedential summary orders, but cites them to show that the Second Circuit has not decided this issue. Indeed, there are no reported Second Circuit cases citing *Silva*.

[13] To the extent Plaintiff is arguing that Moore violated his due process rights by failing to give the redundancy explanation at the Hearing, the argument fails. *See Ponte v. Real*, 471 U.S. 491, 497 (1985) (explaining "that prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, but that they may do so either by making the explanation a part of the 'administrative record' in the disciplinary proceeding, or by presenting testimony in court," and that "so long as the reasons are logically related to preventing undue hazards to institutional safety or correctional goals, the explanation should meet the due process requirements as outlined in *Wolff*" (internal quotation marks omitted)).

However, the Court declines to consider the Witness Interview Notice submitted by Defendants, (Frankel Decl. Ex. 2), as it is not clearly incorporated by reference or integral to the Complaint, *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (explaining that "a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough").

of Plaintiff's earlier description of "the contour of his defense"—he "wanted to establish through inmate witnesses[] that another party had means and opportunity to enter his cell" to plant the weapons there.  (Compl. 18 ¶ 13.)  Specifically, Ramos, Shobey, and Romero already testified that Plaintiff's cell was routinely left open for periods of 5 minutes or longer and that other prisoners had entered Plaintiff's cell during those times; thus, any additional testimony to this effect could be considered redundant.  (*Id.* at 19 ¶ 14.)  This is a sufficient ground upon which to deny witness testimony in a disciplinary proceeding.  *See Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) ("The refusal to call witnesses whose testimony would be redundant is not a violation of any established due process right."); *Russell v. Selsky*, 35 F.3d 55, 58–59 (2d Cir.1994) (holding that a prison hearing officer "did not violate any clearly established constitutional or statutory right" for refusing to call inmate's suggested witnesses, who would have given "duplicative or non-probative" testimony); *Albritton v. Morris*, No. 13-CV-3708, 2018 WL 1609526, at *15 (S.D.N.Y. Mar. 29, 2018) (holding that denying "any additional testimony [as] redundant and unnecessary given the voluminous testimony given by" other witnesses was "a sufficient basis for refusing to call" them).  Plaintiff alleges no facts suggesting that the excluded witnesses would have provided additional or unique testimony that would not have been redundant and instead would have bolstered his defense.  *See Young v. Freer*, 829 F. Supp. 32, 34 (N.D.N.Y. 1993) ("Plaintiff has not put forth any valid reason for calling seven additional witnesses other than that he should have been allowed to do so in order to insure due process of law.  Unfortunately, however, plaintiff has no due process right in calling an unlimited number of witnesses.").

Finally, even assuming Moore's decision to preclude the testimony of Plaintiff's additional witnesses was erroneous, his Hearing disposition was still supported by "some

evidence in the record" and thus did not violate Plaintiff's due process rights. *Sira*, 380 F.3d at 76 (internal quotation marks omitted). Moore's written disposition specified that he relied on the testimony of C.O.s Bradley and Jackson that Plaintiff's cell "is closed as soon as he is leaving the unit," and thus "he did not believe the weapons could have been placed in Plaintiff's cell in 'a very short amount of time,' as [Plaintiff] claimed." (Compl. 21 ¶ 18.) While Plaintiff may disagree with this decision and believe the C.O.s' testimony to be false, "[u]nder the standard enunciated in *Wolff*, the Court will not independently assess the . . . officer's reliability," *Hinebaugh v. Wiley*, 137 F. Supp. 2d 69, 77 (N.D.N.Y. 2001), and such direct testimony from an officer certainly constitutes *some* evidence, *see Homen v. Hasty*, 229 F. Supp. 2d 290, 297 (S.D.N.Y. 2002) (finding the some evidence standard satisfied where the hearing officer reviewed, "the incident reports [and] the statements of the officers involved"); *Hinebaugh*, 137 F. Supp. 2d at 77 (concluding that the testimony of the corrections officers "provided 'some evidence' for the disciplinary body to make their finding regarding [the inmate]'s guilt").

Therefore, the Court grants Moore's Motion To Dismiss the due process claim against him.

c. Burnett

Plaintiff alleges that Burnett violated his due process rights by being a biased Hearing Officer during the Administrative Segregation Hearing and, further, that DOCCS failed to meaningfully review Plaintiff's continued placement in Administrative Segregation.[14]

[14] Plaintiff also argues that the Administrative Segregation Hearing and resulting review process violated his rights under state law. (Compl. 43–45 ¶¶ 54–55, 57–60, 63; *id.* at 46 ¶ 67.) However, the failure to follow a state law or a prison regulation alone does not violate due process. *See Golian v. New York City Admin. for Children Servs.*, 282 F. Supp. 3d 718, 727 (S.D.N.Y. 2017) ("The mere failure to follow state law does not violate substantive due process." (citing *Kuck v. Danaher*, 600 F.3d 159, 167 (2d Cir. 2010))); *Holland v. City of New York*, 197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016) ("An alleged violation of a prison policy, directive, or

Administrative Segregation is not punitive, and thus is governed by less restrictive procedural protections than those required under *Wolff*. *See Proctor v. LeClaire*, 846 F.3d 597, 609 n.5 (2d Cir. 2017) (contrasting administrative segregation decisions with those having a "sole purpose" of "punishment," which require "more robust procedural protections" (internal quotation marks omitted)); *id.* at 601 (describing the "different purpose" administrative segregation serves as compared to disciplinary segregation). The Second Circuit recently explained the due process requirements governing initial Administrative Segregation decisions:

> Before confining an inmate in Ad Seg, prison officials must provide "some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to [Ad Seg]," although not necessarily a full hearing. [*Hewitt v. Helms*, 459 U.S. 460, 476 (1983)]. Once that has occurred, prison officials need only conduct "an informal, nonadversary evidentiary review" of whether the confinement is justified. [*Id.*] at 476. Their final Ad Seg decision may "turn[ ] largely on purely subjective evaluations and on predictions of future behavior." *Id.* at 474 (internal quotation marks omitted).
>
> Once an inmate has been confined in Ad Seg, *Hewitt* mandates that prison officials "engage in some sort of periodic review of the confinement" to verify that the inmate "remains a security risk" throughout his term. *Id.* at 477 n.9. Periodic Ad Seg reviews are also flexible and may be based on "a wide range of administrative considerations," including but not limited to observations of the inmate in Ad Seg, "general knowledge of prison conditions," misconduct charges, ongoing tensions in the prison, and any ongoing investigations. *Id.* The purpose of these periodic reviews is to ensure that the state's institutional interest justifying the deprivation of the confined inmate's liberty has not grown stale and that prison officials are not using Ad Seg as "a pretext for indefinite confinement of an inmate." *See id.*

*Id.* at 609 (some citations omitted)). The Second Circuit then identified three criteria that reviewing prison officials must satisfy to provide "meaningful" periodic review. *Id.* at 610–11. First, they must actually evaluate whether the inmate's continued Ad Seg confinement is justified," as opposed to "go[ing] through the motions" of reviewing and instead sticking to "a

---

regulation, in and of itself, does not give rise to a federal claim, because '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.'" (quoting *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990))).

pre-review conclusion that the inmate will be confined in Ad Seg no matter what the evidence shows." *Id.* at 610. "Second, the reviewing officials must evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available;" in other words, "ongoing Ad Seg reviews may not be frozen in time, forever rehashing information addressed at the inmate's initial Ad Seg determination." *Id.* at 611. And third, "the reviewing officials must maintain institutional safety and security (or another valid administrative justification) as their guiding principles throughout an inmate's Ad Seg term," and may not permit the segregation to "morph into confinement that persists for improper purposes." *Id.*

With respect to the initial Administrative Segregation decision, Plaintiff was provided with the process he was due. Plaintiff received a copy of Holzapfel's MBR and met with his assigned Employee Assistant well in advance of Sipple's Administrative Segregation Recommendation. (Compl. 29 ¶¶ 21–24.) He also was apparently provided a copy of Sipple's recommendation, although it is unclear when, which cites Plaintiff's purported threats against Holzapfel as the basis for Administrative Segregation. (*Id.* at 42 ¶¶ 48–49.) Furthermore, Plaintiff received an Administrative Segregation Hearing before Burnett at which the Recommendation was read into the record and "both . . . Plaintiff and numerous witnesses" testified, "confirm[ing] that a personal conflict" existed between Plaintiff and Holzapfel. (*Id.* ¶¶ 50–51.) Plaintiff specifically testified regarding Hozapfel's alleged harassment and filing of false Misbehavior Reports against him, and "expressly and repeatedly denied issuing any threats to [Holzapfel] or attempting to procure a weapon." (*Id.* at 43 ¶ 51.) This process was thus sufficient to satisfy procedural due process. *See Proctor*, 846 F.3d at 609 (requiring only "notice of the charges" and "an informal, nonadversary evidentiary review of whether the confinement is

justified" (internal quotation marks omitted)); *Rodriguez v. Phillips*, 66 F.3d 470, 480 (2d Cir.

1995) (noting that this review includes "whatever statement the inmate wishes to submit, within

a reasonable time after confining him to administrative segregation" (alterations and internal

quotation marks omitted)); *Parson v. Miller*, No. 16-CV-167, 2018 WL 4233810, at *5

(N.D.N.Y. May 25, 2018) (finding no due process violation where the plaintiff received the

segregation recommendation and was "present and an active participant in th[e] hearing"),

*adopted by* 2018 WL 4228427 (N.D.N.Y. Sept. 5, 2018); *see also Wheeler-Whichard v. Roach*,

468 F. App'x 28, 30 (2d Cir. 2012) ("[P]rior to his initial transfer to the MPC, [the plaintiff] was

informed of the reasons for his eventual placement and was afforded an opportunity to express

his views.").

Plaintiff alleges that Burnett "applied the wrong burden of proof" at the Hearing by

requiring Plaintiff to prove his confinement was not necessary. (Compl. 44 ¶ 56; *see also id.* at

42 ¶ 50.) It is true that "[a]dministrative segregation admission results from a determination by

[DOCCS] that the inmates' presence in general population would pose a threat to the safety and

security of the facility," 7 N.Y.C.R.R. § 301.4(b), but the Court was unable to find any case or

statute requiring DOCCS to satisfy a certain burden of proof at an Administrative Segregation

Hearing. To the extent that Plaintiff alleges that this burden shifting shows Burnet's bias as a

Hearing Officer, he provides only "subjective beliefs and conclusory allegations," rather than

factual details rendering such a claim plausible. *Dobbins v. Ponte*, No. 15-CV-3091, 2017 WL

3309726, at *6 (S.D.N.Y. Aug. 2, 2017). Plaintiff also alleges that the evidence at the hearing

was insufficient to suggest that he "presented a generalized threat" to the safety and security at

Sullivan, but rather showed only that he posed an "individualized threat" to "a single Officer"

which could have been resolved by transferring Plaintiff to another facility. (Compl. 43–44

¶¶ 52, 56.)  However, DOCCS officials are afforded "substantial discretion" in making this determination, *Proctor*, 846 F.3d at 601, and, provided it is supported by "substantial evidence," courts typically defer to DOCCS's decision that an inmate poses a security risk, *Giano v. Selsky*, No. 91-CV-166, 2002 WL 31002803, at *6 (N.D.N.Y. Sept. 5, 2002) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 n.14 (1981)); *see also Davis v. Barrett*, No. 02-CV-545, 2011 WL 2421109, at *3 (W.D.N.Y June 13, 2011) ("[T]he Court must find 'some evidence' in the record that could support the hearing officer's conclusion that placement in administrative segregation was warranted." (citing *Taylor v. Rodriguez*, 238 F.3d 188, 194 (2d Cir. 2001))).  Holzapfel's allegations regarding Plaintiff's behavior, the reports from informants, and the testimony adduced at the hearing regarding the tumultuous relationship between Plaintiff and Holzapfel clearly constitute "some evidence" upon which Barrett could have reasonably concluded that Plaintiff posed a threat to prison security or safety.  (Compl. 42–43 ¶¶ 48–49, 51, 53; *id.* at 47 ¶ 71 (alleging that Sipple, Maxwell, LeConey and Holzapfel all testified at the Hearing).)  The Court was unable to find any case requiring more than threats to a single officer or a threat which could be resolved by a facility transfer in order to satisfy the due process requirement for an Administrative Segregation determination.  (*Contra* Compl. 45 ¶ 62.)  Thus, Plainitff's due process claim against Burnett for his Administrative Segregation decision is dismissed.

Plaintiff also alleges that "[p]rison [o]fficials failed to provide a meaningful periodic [r]eview process that fairly considers Plaintiff's continued placement in Administrative Segregation," (*id.* at 46 ¶ 67), and instead provided reviews that were "merely perfunctory" and a "sham," (*id.* ¶ 68).  However, Plaintiff does not allege *which* officials provided these procedurally defective periodic reviews.  (*Id.* at 46–47 ¶¶ 67–70 (referring to "[p]rison [o]fficials" only).)  Indeed, while he describes the actions of Burnett and other DOCCS officials

in detail, (*see id.* at 47 ¶ 71), he alleges only that "[c]orrectional [s]taff] who allegedly conducted Plaintiff's Administrative Segregation sixty [d]ay review [s]tatus" created a "sham" justification for his continued confinement, (*id.* ¶ 72). However, in light of Plaintiff's pro se status, and because Burnett's name appears on the Review sheets attached as exhibits to the Complaint, the Court assumes that Plaintiff meant to bring this claim against Burnett.

The allegations in the Complaint, taken alone, are conclusory. (Compl. 46 ¶ 67 (alleging lack of "a meaningful periodic [r]eview process"); *id.* ¶ 68 (calling the reviews "merely perfunctory" and a "sham"); *id.* at 47 ¶ 69 (alleging "a factual lack of good faith and pretextuality").) However, in combination with the attached Sixty-Day Review forms, the Court finds that Plaintiff has sufficiently alleged a procedural due process claim. The first review form, dated December 6, 2016, begins with a "Summary report of the facility three-member committee," which includes Burnett. (Compl. Ex. P.) That section states that Plaintiff was initially placed in Administrative Segregation "after credible information was obtained that [Plaintiff] was actively conspiring to either harm [Holzapfel], himself, or have the officer harmed by another inmate." (*Id.*) However, as of the review date, Plaintiff "ha[d] acted appropriately while confined in Ad Seg." (*Id.*) The form also notes as "other factors" favoring continued confinement that "Holzapfel remains working at Sullivan . . . Any release of [Plaintiff] would jeopardize the officer[']s well being." (*Id.*) This decision was then affirmed by the Superintendent/Deputy Commissioner for Correctional Facilities, although the signature is illegible, "[b]ecause of the threats toward the officer." (*Id.*) The second Sixty-Day Review form, dated February 1, 2017, is *identical* to the first form, except that the Superintendent neglected to provide any reason for affirming the Committee's decision to maintain Plaintiff's Administrative Segregation. (Compl. Ex. Q.) Therefore, as alleged and provided for on these

forms, Plaintiff has plausibly alleged that Burnett and the Committee did not provide a meaningful review of whether Plaintiff's *continued* confinement was justified; rather, their initial justification was "frozen in time" and they continued to "rehash[] information addressed at [Plaintiff's] initial Ad Seg determination." *Proctor*, 846 F.3d at 610–611. Although the concern regarding Plaintiff's threats to Holzapfel is a valid one, it must remain valid "throughout [Plaintiff's] Ad Seg term." *Id.* at 611. However, nowhere on the forms does Burnett mention Plaintiff's "present and future behavior" and how that relates to his past threats against Holzapfel. *Id.*; *cf. Parson*, 2018 WL 4233810, at *8 (granting summary judgment to defendant who discussed plaintiff's past, present, and future behavior and tied it to the justification for administrative segregation). Indeed, as Plaintiff alleges, the December 6, 2016 review form mentions that DOCCS received "credible information" that Plaintiff was "actively conspiring" to "have the officer harmed by another inmate," (Compl. Ex. P), but there was no such testimony at the Hearing, (Compl. 47 ¶ 71), rendering this justification for continued segregation even less credible and more "embellished" as time went on, (*id.* ¶ 72).

The Court therefore denies Burnett's Motion To Dismiss the procedural due process claim relating to the Administrative Segregation review process.[15]

3. Claims Against Holzapfel

Construing the Complaint liberally, Plaintiff raises two claims against Holzapfel: (1) for filing a false Misbehavior Report in retaliation for Plaintiff's filing Grievances against him; and (2) for assaulting him during a pat frisk search. The Court will address each claim separately.

[15] Burnett did not argue that he was entitled to qualified immunity for this alleged constitutional violation. (*See* Defs.' Mem. 25.)

a.  False Misbehavior Report

Plaintiff alleges that Holzapel "sexual[ly] abuse[d] and harras[ed] Plaintiff with bogus

Misbehavior Reports in retaliation for Grievance[s] Plaintiff filed against . . . Holzapfel."

(Compl. 48 ¶ 73.)  When Plaintiff warned Holzapfel that he would take legal action against him,

Holzapfel "said he did not care because the Attorney General will protect him against any

lawsuit filed against him."  (*Id.*)  Plaintiff filed a Grievance with respect to Holzapfel's filing of

Misbehavior Reports, but it was denied as untimely.  (Compl. Ex. N.)  Holzapfel thus argues that

this claim should be dismissed because Plaintiff failed to exhaust his administrative remedies

under the Prison Litigation Reform Act ("PLRA").  (Defs.' Mem. 12–14.)

The PLRA provides that "[n]o action shall be brought with respect to prison conditions

under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted."  42

U.S.C. § 1997e(a).  This "language is 'mandatory': An inmate 'shall' bring 'no action' (or said

more conversationally, may not bring any action) absent exhaustion of available administrative

remedies."  *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).  This requirement applies to "all inmate

suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), "regardless of the relief

offered through administrative procedures," *Booth v. Churner*, 532 U.S. 731, 741 (2001).

Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison

grievance system holds out, and doing so *properly*. . . . Proper exhaustion demands compliance

with a prison grievance system's deadlines and other critical procedural rules."  *Williams v.

Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (alterations, citations, and internal quotation marks

omitted).  The New York State Department of Corrections and Community Supervision Inmate

Grievance Program ("IGP") outlines the three-step grievance process that applies to grievances

filed by inmates in New York State correctional facilities.  *See* 7 N.Y.C.R.R. § 701 et seq.; *see also Abdallah v. Ragner*, No. 12-CV-8840, 2013 WL 7118083, at *2 (S.D.N.Y. Nov. 22, 2013) (same).  Only after the third step, that is, "after [Central Office Review Committee] ["]CORC["] has reviewed [a prisoner's] appeal and rendered a decision[,] are New York's grievance procedures exhausted." *Gardner v. Daddezio*, No. 07-CV-7201, 2008 WL 4826025, at *2 (S.D.N.Y. Nov. 5, 2008).

Here, Plaintiff attached an exhibit to the Complaint clearly stating that the CORC found that "his allegations of false misbehavior reports [we]re untimely" and declined to address them. (Compl. Ex. N.)  This constitutes a failure to exhaust.  *See Woodford v. Ngo*, 548 U.S. 81, 83–84 (2006) (holding that filing an untimely grievance is not proper exhaustion); *Williams v. Comstock*, 425 F.3d 175, 177 (2d Cir. 2005) (per curiam) ("[T]he failure to timely file the grievance in accordance with IGP rules amounted to a failure to exhaust administrative remedies in this case.").  This is true even assuming Plaintiff appealed his separate disciplinary hearing disposition which was allegedly based on the false Misbehavior Reports.  *See Scott v. Gardner*, 287 F. Supp. 2d 477, 489 (S.D.N.Y. 2003) ("Although completion of the disciplinary appeal process may satisfy the exhaustion requirement with respect to [the plaintiff's] claims that he was denied due process in the disciplinary proceedings, allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved."), *on reconsideration in part*, 344 F. Supp. 2d 421 (S.D.N.Y. 2004), *and on reconsideration in part*, No. 02-CV-8963, 2005 WL 984117 (S.D.N.Y. Apr. 28, 2005).  Therefore, because Plaintiff's failure to exhaust "is clear on the face of the [C]omplaint," *Williams*, 829 F.3d at 122, and "because Plaintiff alleges no facts from which the Court could infer that the IGP was 'unavailable' to him such that his failure to exhaust [could] be excused," *Hydara v. Burger*, No. 14-CV-1415, 2018 WL 1578390, at *5

(S.D.N.Y. Mar. 29, 2018) (collecting cases)[16]—indeed, he submitted a grievance for this claim and appealed several other grievances to CORC during the same time period, (*see* Compl. Exs. A, D, G, H, N, O, R, S)—the Court grants Holzapfel's Motion To Dismiss this claim.[17]

b. Pat Frisk

Finally, Plaintiff alleges that on March 1, 2016, Holzapfel violated his Eighth Amendment rights by groping and fondling his private parts under the guise of conducting a

[16] The PLRA contains one "textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. "Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* Available "grievance procedures . . . are capable of use to obtain some relief for the action complained of." *Id.* at 1859 (internal quotation marks omitted). In *Ross*, the Supreme Court provided "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* The Supreme Court explained that an administrative remedy is unavailable when:

> (1) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;
> (2) an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it;
> (3) prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*See Ross*, 136 S. Ct. at 1859–60. The Second Circuit recently noted "that the three circumstances discussed in *Ross* do not appear to be exhaustive," but declined to "opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use." *Williams*, 829 F.3d at 123 n.2.

[17] Although not necessary to decide, the Court notes that Plaintiff's allegations of retaliation border on being wholly conclusory, merely asserting that Holzapfel filed the Misbehavior Reports "in retaliation" for the grievances and that he did so against other sensorially disabled inmates. (Compl. 48 ¶¶ 73–74.) Such claims would be insufficient to plausibly allege a retaliation claim. *See Dolan*, 794 F.3d at 295 (requiring retaliation claims to be "supported by specific and detailed factual allegations, not stated in wholly conclusory terms" (internal quotation marks omitted)); *id.* at 294 (listing elements of First Amendment retaliation claim).

body pat frisk. (Compl. 49 ¶ 75.)[18] Holzapfel argues that Plaintiff has not plausibly alleged an Eighth Amendment violation. (Defs.' Mem. 18–20.)

The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials. *See Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991). "To state an Eighth Amendment claim, a prisoner must allege two elements, one subjective and one objective." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015). "First, the prisoner must allege that the defendant acted with a subjectively 'sufficiently culpable state of mind.' Second, he must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Id.* (citations and internal quotation marks omitted) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The Second Circuit has held that "[a] corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Id.* at 257; *see also id.* (holding that "a single incident of sexual abuse" can constitute cruel and unusual punishment "if sufficiently severe or serious" (citing *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997))). "In determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Id.*at 257–58 (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).

[18] To the extent Plaintiff is arguing that other Defendants conspired to cover up or enable Holzapfel's sexual misconduct, he does not identify which Defendants, and his allegations, without more, are too conclusory to state a claim. (Compl. 49 ¶¶ 77–78.) *See Ciambriello*, 292 F.3d at 325 ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." (internal quotation marks omitted)).

Here, Plaintiff alleges that on March 1, 2016, Holzapfel "sexually abused Plaintiff to satisfy his homosexual proclivities by fondling Plaintiff's private parts under the pretext" that he "was conducting a body pat frisk for suspicion of contraband." (Compl. 49 ¶ 75.)[19] Specifically, "Holzapfel placed his bare hands underneath Plaintiff's undershorts[,] groping Plaintiff's penis and testicles." (*Id.*) "When Plaintiff protested . . . Holzapfel[] told Plaintiff to shut-up or get written-up for refusing a body [p]at [f]risk and [d]isobeying a [d]irect [o]rder." (*Id.*)

Even assuming that these allegations are sufficient to satisfy the objective prong, *but see Perez v. Ponte*, 236 F. Supp. 3d 590, 619 (E.D.N.Y. 2017) (collecting cases for proposition that "'pat frisks' . . . typically do not violate the Eighth Amendment's proscription against Cruel and Unusual Punishment"), *adopted by* 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017), they are insufficient to plausibly show that Holzapfel acted "to arouse or gratify [himself] or humiliate [Plaintiff]," *Crawford*, 796 F.3d at 257–58. The only allegation regarding Holzapfel's intent or state of mind is that he was acting "to satisfy his homosexual proclivities," but Plaintiff provides *no* facts substantiating this assertion. (Compl. 49 ¶ 75; *see also* Pl.'s Obj. Letter 3 ("Holzapfel touched [P]laintiff 'maliciously' with the intent of deriving sexual arousal and/or gratification from the contact with his bare hands.").) Instead, as alleged, Holzapfel stated that he was "conducting a body pat frisk for suspicion of contraband," and when Plaintiff protested, he told him to "shut-up or get written-up for refusing a body [p]at [f]risk." (*Id.*) Holzapfel is not alleged to have made any sexually inappropriate comments or gestures. *See Boddie*, 105 F.3d at 859–61 (finding no Eighth Amendment violation from incidents including a female corrections officer

[19] To the extent there were other instances of sexual abuse, Plaintiff does not specifically identify or describe them such that they could state an Eighth Amendment claim. (*E.g.*, Compl. 48 ¶ 73 (noting that Holzapfel "continued to sexual[ly] abuse and harass Plaintiff").) *See Crawford*, 796 F.3d at 257 ("Recurrences of abuse, while not a prerequisite for liability, bear on the question of severity.").

making a pass at the plaintiff, squeezing his hand, touching his penis, calling him a "sexy black devil," and bumping into him "with her whole body vagina against penis"); *Grant v. Norfleett*, No. 17-CV-328, 2017 WL 1902150, at *3 (D. Conn. May 9, 2017) ("[T]he Complaint includes only a conclusory allegation that the defendants conducted the search for their own sexual gratification, and an assertion that on occasions after the plaintiff was strip searched, the defendants 'watched him like a piece of meat.'"); *see also Shaw v. Prindle*, 661 F. App'x 16, 19 (2d Cir. 2016) (noting that the court "cannot infer solely from the thoroughness of the search"—described as "excessive searching of [the] crotch area and in between his buttocks and massaging of his rectum and groin area"—that the defendant "intended to search . . . with intent to arouse or gratify [his] sexual desires or to humiliate [the plaintiff]" (alterations and internal quotation marks omitted); *cf. Crawford*, 796 F.3d at 257–58 (finding Eighth Amendment violation where the defendant "fondl[ed] and squeeze[ed] [the plaintiff's] penis in order to make sure [he] did not have an erection," because "[t]here is no penological justification for checking to see if an inmate has an erection"); *id.* at 258–59 (noting that "demeaning comments, including the statements 'that doesn't feel like a penis to me,' 'I'll run my hands up the crack of your ass if I want to,' and subsequent taunts about having seen [the plaintiff's] penis," all "suggest[ed] that [the defendant] under took the search in order to arouse himself, humiliate [the plaintiff], or both").

Thus, the Court grants Holzapfel's Motion To Dismiss the Eighth Amendment claim.

## III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part. All claims are dismissed except for the due process claim relating to Burnett's involvement in the Administrative Segregation review process. However, because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice. *See Terry*

*v. Inc. Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile"). Should Plaintiff choose to file an amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein. The new amended complaint will replace, not supplement, the complaint currently before the Court. It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual allegations raised in supplemental declarations, affidavits, or letters. If Plaintiff fails to abide by the 30-day deadline, this action could be dismissed with prejudice.

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 36), and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated: September ____, 2018
White Plains, New York

______________________________
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

*v. Inc. Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile"). Should Plaintiff choose to file an amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein. The new amended complaint will replace, not supplement, the complaint currently before the Court. It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual allegations raised in supplemental declarations, affidavits, or letters. If Plaintiff fails to abide by the 30-day deadline, this action could be dismissed with prejudice.

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 36), and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated: September 28, 2018
      White Plains, New York

                                     KENNETH M. KARAS
                                     UNITED STATES DISTRICT JUDGE